## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MARK BULLOCK, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | Case No. CIV-09-24-HE |
| | ) | |
| ERIC FRANKLIN, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATION

Petitioner, Mark Bullock, appearing *pro se*, has filed a petition for habeas corpus relief pursuant to 28 U.S.C. § 2254 [Doc. #1] and a Brief in Support [Doc. #3] challenging the constitutionality of his state court conviction.  He has also filed a motion requesting a stay of the case [Doc. #12] (Motion for Stay).  And on May 8, 2009, Petitioner filed a document entitled "Petition In Argument of Delay in Providing Petitioner and Court with Records of Proceedings Brief in Support of Writ of Habeas Corpus [Doc. #16] (Motion for Order).  It is recommended that both the Motion for Stay and the Motion for Order be denied.  It is further recommended that the petition for writ of habeas corpus be denied.

## I.    Relevant Case History and Facts of the Case

Petitioner was convicted in the District Court of Oklahoma County, State of Oklahoma, Case No. CF-2004-3010, of First Degree Felony Murder While in the Commission of Robbery with a Firearm.  He was sentenced to life imprisonment.  Petitioner appealed his conviction to the Oklahoma Court of Criminal Appeals (OCCA).  The OCCA

affirmed Petitioner's conviction on October 9, 2007.  *See* Response to Petition for Writ of

Habeas Corpus (Response) [Doc. #8], Exhibit 3, OCCA Opinion.

At the trial, the State's primary witness, Terri Cosby, testified that she witnessed the

murder of her fiancé, Connell Mason, on June 20, 2001.  Ms. Cosby and Mr. Mason had

spent the evening hours of June 19 and the early morning hours of June 20 making "runs"

to buy crack cocaine in various parts of Oklahoma City.  Mr. Mason had withdrawn $300

from ATM machines for this purpose.  The two eventually picked up Petitioner at his home,

and the three of them drove to another nearby home where they were able to purchase more

crack cocaine.  Back at Petitioner's home, the trio was joined by a younger man,[1] and all four

smoked the recently purchased crack cocaine.  Sometime later, a drug dealer stopped by to

sell Mr. Mason even more crack cocaine.

Ms. Cosby's testimony[2] included her rendition of Petitioner's suggestion that they sell

some of the remaining drugs at a profit.  Petitioner convinced Mr. Mason to rent a motel

room from which to sell the drugs.  According to Ms. Cosby, Petitioner promised to bring

drug clients to the motel.  Ms. Cosby testified that after she and Mr. Mason had rented the

motel room, Petitioner and the young man, with whom Ms. Cosby, Mr. Mason and Petitioner

had been smoking earlier, came to the room.  Ms. Cosby testified that Petitioner asked for

"a forty" but produced no money.  When Mr. Mason and Ms. Cosby asked where the $40

---

[1]This participant was later identified as Jerome Bullock.

[2]*See* Transcript of Trial Proceedings Vol. 1, Case #CF-2004-3010 (Tr. Vol. I) at 51-163.

was, Petitioner "said he had to go get it."  While Petitioner was out of the room, the young man shot Mr. Mason and then robbed him.  Ms. Cosby testified that Petitioner asked, "'What's going on in here?'" when he returned to the room, "like he had not the clue."  Tr. Vol. I at 69.  Petitioner and the shooter left the motel room followed by Ms. Cosby.  Ms. Cosby testified that she saw the young man hand the gun to Petitioner.  Ms. Cosby then re-entered the room, got the keys to the car that she and Mr. Mason had been driving that night, and went back to the house she had been sharing with Mr. Mason.

Charges initially filed against Petitioner in 2001 were dismissed by the district attorney.  New charges were filed in 2004 when an acquaintance of Petitioner, Vernon Perry, came forward with new evidence.  Mr. Perry testified at Petitioner's trial.  *See* Tr. Vol. III at 107-167.  When he testified, Mr. Perry was incarcerated in the Oklahoma County Jail awaiting trial on charges of forgery.  Mr. Perry testified that one evening in the summer of 2001, he heard Petitioner tell his sister Diane Bullock, who is Jerome Bullock's mother, about a shooting and a robbery.  Mr. Perry testified that Petitioner told Ms. Bullock that "they was only supposed to rob Connell, he wasn't supposed to shoot him."  Tr. Vol. III at 141.  Mr. Perry further testified that Petitioner told his sister that "he think Jerome might've killed Connell."  Tr. Vol. III at 142.

## II.    **Petitioner's Claims for Federal Habeas Relief**

Petitioner contends that he was (1) constructively denied the right to be present during trial; (2) denied a fair trial because the testimony of a state witness was improperly bolstered when she was allowed to wear street clothes and take a Bible into the courtroom; (3) denied

due process in that his involuntary statement to police was introduced into evidence; (4)

denied due process in that the evidence was insufficient to support the conviction; and (5)

denied a fair and impartial trial by cumulative error.  Petitioner raised each of these claims

for relief on direct appeal of his conviction, and the OCCA addressed the merits of each

issue.  Thus, Petitioner has fully exhausted state court remedies for the claims raised in his

federal habeas petition.

### III.   Pending Motions

#### A.   Motion for Stay

On February 20, 2009, Petitioner filed a motion requesting this Court to grant a stay

of proceedings so that he could file a state application for post-conviction relief.  *See* Motion

for Stay.   It appears that Petitioner mistakenly believes that to exhaust his claims of

constitutional error, he should have raised the claims in an application for post-conviction

relief before seeking habeas relief in this Court.[3]

Petitioner is correct in his belief that a state prisoner generally must exhaust available

state court remedies before seeking a writ of habeas corpus in federal court.  *See* 28 U.S.C.

§ 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  The exhaustion requirement

is satisfied, however, when a federal claim has been "fairly presented to the state courts,"

such that the State has had "an initial opportunity to pass upon and correct alleged violations

---

[3]Respondent stated in his response that "Petitioner did not file a request for post-conviction relief."  Response at 1.  Respondent acknowledged, however, that Petitioner "has exhausted his state court remedies" for the five grounds for habeas relief asserted in this action.  Response at 2.

4

of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (quotation omitted). The petitioner must have invoked "one complete round of the State's established appellate review process," including a petition for discretionary review to the state's highest court when such review is available. *O'Sullivan*, 526 U.S. at 845. In his direct appeal, Petitioner presented all claims raised in this action to the OCCA, Oklahoma's highest court for criminal appeals. He has, therefore, satisfied the exhaustion requirement for the issues raised in his petition for writ of habeas corpus. *See West v. Addison*, 127 Fed. Appx. 419, 421 n. 1 (10th Cir. Mar. 30, 2005) (petitioner exhausted state court remedies by raising all issues on appeal to the Oklahoma Court of Criminal Appeals).[4]

Because Petitioner has exhausted his state court remedies as to all claims raised in his federal habeas petition, it is recommended that his Motion for Stay be denied.

**B.     Motion for Order**

On April 28, 2009, this Court ordered Respondent to supplement the record in this case by filing a copy of the videotaped police interview of Petitioner and a copy of the transcript of that interview. Respondent was granted ten days within which to comply with the Order. Petitioner's pending Motion for Order filed on May 8, 2009, appears to relate to this Court's Order of April 28, 2009.[5] Petitioner apparently is objecting to the length of time

_____

[4]Petitioner does not state that there are grounds for habeas relief other than those he has raised in his Petition and none are apparent to this Court. As Respondent points out, if there are unexhausted grounds for habeas relief, they would likely be barred by the one-year statute of limitations for filing federal habeas claims.

[5]Petitioner's Motion is somewhat confusing because Petitioner also references and attaches a request he made to the Court Clerk for the Oklahoma County District Court for records from his
(continued...)

within which Respondent was to supplement the record and asks the Court "to refuse the delay, and further order the 'State of Oklahoma' to issue the records of the trial proceedings and videotape in question at once." However, Respondent filed a copy of the videotape and the transcript of the interview only two days after the Court order, on April 30, 2009. The state trial record supplied by Respondent is complete for the purposes of this habeas action. Therefore, Petitioner's Motion for Order is moot and should be denied.

## IV.   <u>Analysis</u>

### A.   <u>Standard of Review for Habeas Claims</u>

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) standards of review apply to Petitioner's grounds for relief as each ground raised by Petitioner was adjudicated on the merits by the OCCA. *See Turrentine v. Mullin*, 390 F.3d 1181, 1188 (10th Cir. 2004). Under AEDPA, this Court may grant Petitioner habeas relief only if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under this standard, judicial review is directed to the result of the state appellate court's decision, not its reasoning. *See Gipson v. Jordan*, 376 F.3d 1193, 1197 (10th Cir. 2004) ("[W]e defer to the [state court's] decision unless we conclude that its result – not its rationale – is 'legally or factually unreasonable.'").

---

[5](...continued)
case for an appeal. That separate request may arise from Petitioner's mistaken understanding that he needs to file an application for post-conviction relief in order to exhaust his state court remedies.

A state court decision is "contrary to" clearly established federal law for purposes of § 2254 if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from" the result reached by the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000).  It is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be "diametrically different," "opposite in character or nature," or "mutually opposed" to the Supreme Court decision itself.  *Id*. at 406.

A state court decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "AEDPA's conception of objective unreasonableness lies 'somewhere between *clearly* erroneous and unreasonable to all reasonable jurists.'" *House v. Hatch*, 527 F.3d 1010, 1019 (10th Cir. 2008) (*quoting Maynard v. Boone*, 468 F.3d 665, 670 (10th Cir. 2006)).  "Thus, 'only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254.'"  *Id*. (*quoting Maynard* at 671).

**B.**   **Ground One – Right to Be Present During Trial**

Petitioner contends that his fundamental right to be present at trial was constructively denied because his diabetes interfered with his ability to concentrate on the criminal proceedings against him.   Petitioner's counsel informed the trial court that Petitioner was diabetic, that he was shaking, and that he was not well.   *See* Tr. Vol. II at 71.   The next day, Petitioner's counsel informed the court that his client was falling asleep and that he had perhaps not received his insulin the night before.   *See* Tr. Vol. III at 104.   He further informed the court that he had "jabbed [Petitioner] a good 30 times" but that Petitioner continued to nod off.   Tr. Vol. III at 198.   The trial court attributed Petitioner's problems to his having made "poor choices," and the trial continued.   Tr. Vol. III at 199.

In considering this ground for relief, the OCCA stated:

> [S]everal times during trial, defense counsel expressed concerns about [Petitioner's] health and lack of attentiveness during the proceedings.   Each time, the trial court inquired about whether [Petitioner] (who is a diabetic) was receiving proper medication and food.   The court was informed that [Petitioner] was receiving insulin at the jail but was simply refusing to eat. The record supports the trial court's conclusion that [Petitioner's] inattentiveness was a product of choice, and that [Petitioner] was not constructively denied his right to be present at his trial.

OCCA Opinion at 2.

The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."   In *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987), a case cited by Petitioner in his appellate brief to the OCCA, the Supreme Court stated that the Confrontation Clause's functional purpose

is to ensure a defendant an opportunity for cross-examination. *Stincer* held that a criminal defendant's Sixth Amendment rights were not violated by his having been excluded from an in-camera proceeding during which the trial judge determined whether two young children were competent to testify. In this case, Petitioner was physically present during all phases of his trial. Moreover, there is no indication that Petitioner's inattentiveness interfered with his counsel's ability to effectively cross-examine witnesses.

Petitioner also cites *Drope v. Missouri*, 420 U.S. 162 (1975) and *Pate v. Robinson*, 383 U.S. 375 (1966). In *Drope*, the criminal defendant failed to appear during the second day of his trial because he was hospitalized after attempting to take his own life. The trial court proceeded with the trial, without the defendant being present, over defense counsel's objection. Drope's conviction was affirmed on direct appeal based on the state appellate court's determination that Drope's absence from trial was voluntary. The United States Supreme Court found, however, that Drope's suicide attempt raised serious doubts as to whether he was competent to stand trial and reversed Drope's conviction based on violation of his due process rights. In *Pate*, numerous witnesses testified at the trial that the defendant, Mr. Robinson, was insane. The Supreme Court held that the trial court's failure to conduct a hearing to inquire into Mr. Robinson's sanity violated Mr. Robinson's constitutional right to a fair trial. In contrast to *Drope* and *Pate*, Petitioner's competence to stand trial was never at issue in his case. And there is no indication that Petitioner was unable to understand the charge against him or to aid in his own defense. The factual circumstances in *Drope* and *Pate* were materially different than those presented in Petitioner's case. Neither case

9

provides a basis for determining that the OCCA's adjudication of this issue resulted in a decision that was contrary to or an unreasonable application of established Supreme Court law.

Habeas relief on Petitioner's Ground One is not warranted.

### C.    Ground Two – Improper Bolstering of Witness's Testimony

Petitioner claims the trial court erred in allowing Ms. Cosby to appear before the jury wearing street clothes and carrying a Bible.  At the time she testified, Ms. Cosby was incarcerated on a conviction unrelated to Petitioner's case.  Petitioner contends that allowing the witness to carry a Bible amounts to improper bolstering or vouching for the witness's testimony and improperly appealing to a higher authority than the laws of the state. Petitioner argues that the possibility that the jury's sentence "could have been based in part on an outside influence" constitutes "structural error" requiring habeas relief.  *See* Petitioner's Brief in Support at 8.[6]

The OCCA held that allowing an incarcerated witness to testify while wearing street clothes is within the trial court's discretion.  OCCA Opinion at 2.  The OCCA found no error in allowing the witness to carry a Bible because the prosecutor made no attempt to use

---

[6]Petitioner acknowledges that allowing the witness to wear street clothes "may not have been improper."  Petitioner's Brief in Support at 7.  He contends, however, that the witness's having been allowed to wear street clothes indicates the prosecutor was "trying to make a crack addict more palatable to the jury."  *Id.*

religion to bolster the witness's credibility or hide the witness's credibility problems from the jury.  *Id.*[7]

Petitioner relies on *Tumey v. Ohio*, 273 U.S. 510 (1927) for the proposition that structural error[8] results when a decision could have been based in part on an outside influence.  *Tumey* is clearly distinguishable from Petitioner's case.  In *Tumey*, the Supreme Court found error requiring reversal because the defendant was convicted in a hearing before a village mayor who assessed a fine, a portion of which went to him directly and a portion to the village which payed his salary.  The Supreme Court found that the mayor's direct, personal and substantial pecuniary interest in the outcome of the case resulted in a denial of due process.

The Tenth Circuit Court of Appeals has held that a trial judge's refusal to cover a courtroom display of the Biblical "EYE FOR AN EYE" inscription did not constitute structural error.  *See Malicoat v. Mullin*, 426 F.3d 1241, 1252 (10th Cir. 2005).  The Tenth Circuit distinguished cases in which a prosecutor had used religious authority in closing argument.  In *Malicoat*, there was "no evidence that the inscription caused the jurors to bring Bibles into deliberation."  *Id.* at 1251-1252.  The same is true in the instant case.  There is

---

[7]The State's primary witness testified that she was currently living in a halfway house having been convicted of knowingly concealing stolen property. Tr. Vol. I at 51.  She further testified that she had used crack cocaine for several years.  *Id.* at 54-55.

[8]The Supreme Court recently defined "structural errors" as "those [errors] that affect 'the framework within which the trial proceeds[.]'" *Puckett v. United States*, ___ U.S. ___, 129 S.Ct. 1423, 1432 (Mar. 25, 2009) (*quoting Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).

no evidence that the Bible in Ms. Cosby's possession or her appearance at court in street clothes bolstered her credibility or otherwise influenced the jury's verdict.

Because the decision of the OCCA on this issue is neither contrary to, nor an unreasonable application of Supreme Court law, habeas relief should not be granted on this ground.

### D.    Ground Three – Admission of Custodial Statements

Petitioner claims that his constitutional rights were violated as a result of the trial court's admission of involuntary statements allegedly made while he was under the influence of narcotics and while his blood sugar was out of control.  Further, Petitioner contends that his decision to implicate his nephew, Jerome Bullock, in the crime was influenced by his need for nicotine.

Petitioner made the allegedly involuntary statements after having been re-arrested and charged with felony murder in 2004 after an acquaintance, Vernon Perry, came forward with evidence linking both Petitioner and his nephew, Jerome Bullock, to the robbery and murder of Mr. Mason.  Mr. Perry testified at Petitioner's trial.  Tr. Vol. III at 107-167.

The trial court conducted a pre-trial hearing pursuant to *Jackson v. Denno*, 378 U.S. 368 (1964), to determine whether Petitioner voluntarily made the statements to the police. *See* Motion Transcript, April 21, 2006 (Mot. Tr.).  Bill Ricketts, a retired Oklahoma City police detective, testified that he had conducted the custodial interview with Petitioner on

June 10, 2004.[9]  Mr. Ricketts testified that Petitioner was disheveled.  Mot. Tr. at 29.  At one

point during the interview, Mr. Ricketts asked, "You smoke any rock today?"  Transcript of

Interview at 29.  The question was prompted by Petitioner's response after Mr. Ricketts

asked if Petitioner understood his explanation of the felony murder charge lodged against

Petitioner:

> Mark Bullock:        But how am I charged with murder, sir, and I don't even own a
>                      weapon?  Ain't even had a weapon.
>
> Detective Ricketts:  Well, I explained that to you before.
>
> Mark Bullock:        Huh?
>
> Detective Ricketts:  I explained that to you before.  Under the – under the felony
>                      murder statute if you –
>
> Mark Bullock:        Just being there.
>
> Detective Ricketts:  – if you go there with the – and conspire with another person to
>                      – to rob somebody of money or drugs or whatever or – or
>                      commit any crime,  –
>
> Mark Bullock:        Mm hmm.
>
> Detective Ricketts:  – and somebody winds up being killed,  –
>
> Mark Bullock:        Yes, sir.

---

[9]The interview was recorded on videotape, and a transcript of the interview is a part of the record.  *See* Court's Exhibit 6 [Doc. #15] (Transcript of Interview).

Detective Ricketts:   – and somebody winds up being killed, then you're charged with it.  Okay?

Mark Bullock:   Mm hmm.

Detective Ricketts:   And you're – you're charged – you're charged with that murder.

Mark Bullock:   Yes sir.

Detective Ricketts:   And that's what I – that's the point I'm trying to get across to you.

Mark Bullock:   I understand what you're trying to say.

Detective Ricketts:   What am I trying to say?

Mark Bullock:   You trying to tell me, you know, that uh, – to tell – you know, what went on.  And I'm trying to –

Detective Ricketts:   No, no, no, no.  What I'm – what I'm trying to tell you is – is I don't know if you're a little bit high –

Mark Bullock:   Huh?

Detective Ricketts:   And I said I don't know if you are or not.  I don't know.  You – you smoke any rock today?

Mark Bullock:   I just come out of the hospital, sir. . . .  Been there for three days.

Transcript of Interview at 27-29.

At the hearing, Mr. Ricketts explained to defense counsel what he was looking for:

> My main concern was, one, that he was coherent, that he understood what was – what I was asking him, that he could carry on a competent conversation with me and understood what we were  – what I was saying and that he would answer me with clear and concise and logical answers.   And into this interview, I was convinced that he was  – the answers he was giving me  – you [defense counsel] used the word "crack head" – they had a crack-head slant to them, but they were  – they were as concise, I believe, as Mr. Bullock was able to make them.

Mot. Tr. at 20.  Mr. Ricketts acknowledged that Petitioner agreed to answer more questions after Mr. Ricketts offered to let him smoke a cigarette.  Mot. Tr. at 22.  Mr. Ricketts also testified that during the interview Petitioner asked for something in writing.  Mr. Ricketts testified that Petitioner "wanted a deal, a written agreement between the district attorney's office and him, a written contract that he was willing to give up this information and be able to walk."  Mot. Tr. at 24.  Mr. Ricketts stated that he told Petitioner, "I can't promise you that."  *Id.*

Petitioner also testified at the motion hearing.   During cross-examination, the prosecutor introduced a document signed by Petitioner which indicated that he had been informed of his *Miranda* rights.  Mot. Tr. at 55-57.  Additionally, Petitioner stated, "Well, when we first come in there meeting, [Mr. Ricketts] was trying to read some rights to me." Mot. Tr. at 41.   Petitioner testified that he had been in the hospital for three days before his arrest, that two officers arrested him in the hospital and took him to be questioned by Mr. Ricketts, and that he had taken four Lortabs before he left the hospital.  Mot. Tr. at 53-54.[10]

---

[10]At trial, one of the arresting officers testified that he did not recall seeing Petitioner take any medication before or at the time he was discharged.  Tr. Vol. III at 170.

He also testified that he is illiterate and that he did not remember signing any documents during the interview.  He did acknowledge, however, that he had not requested an attorney.  Mot. Tr. at 55-59.  Finally, Petitioner testified that he explained to the officers that he was diabetic and needed insulin.  Mot. Tr. at 60.

Petitioner's trial counsel argued that Petitioner is mentally "slow," that his diabetes interfered with his understanding, that his need for tobacco influenced his decision to make a statement, and that asking for something in writing was "almost to the point of asking for counsel[.]" Mot. Tr. at 66-67.

After listening to the testimony at the motion hearing, the trial judge, who had viewed the videotape of the interview and read the transcript of it, determined that Petitioner understood what was happening during the interview, that Petitioner had voluntarily given the statements, and that Petitioner had never requested to speak to a lawyer.  Mot. Tr. at 68-70.

Rejecting Petitioner's claim on direct appeal, the OCCA made the following findings:

> [T]he trial court held a pretrial hearing on the voluntariness of [Petitioner's] statements, taking testimony and also considering a video recording of the interview itself.  The trial court concluded that [Petitioner] appeared coherent and able to understand the import of the interrogation.  We have reviewed the same record, and find no reason to second-guess the trial court's conclusion.

*See* OCCA Opinion at 2-3.

The Supreme Court has consistently held that a confession cannot be used against an accused unless the confession was voluntarily made:

> The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 225-226 (1973) (internal quotations and citation omitted). A court must assess the totality of the circumstances to determine whether a defendant's confession is voluntary, including both the characteristics of the accused and the details of the interrogation. *Id.* at 226. Over the years, the Supreme Court has delineated some factors to be considered. These factors include:

> the youth of the accused, his lack of education, . . . his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted.

*Id.* (internal citations omitted).

Petitioner's attorney argued that Petitioner is "slow," and Petitioner himself testified that he is illiterate. Petitioner also testified that he had taken four Lortabs for his pain shortly before the interrogation, though this fact is disputed. In any case, the Tenth Circuit Court of Appeals has held that "[t]he state of intoxication does not automatically render a statement involuntary." *United States v. Muniz*, 1 F.3d 1018, 1022 (10th Cir. 1993) (citation omitted). "The test is whether the person's will was overcome, or whether the statement was freely made." *Id.*

17

In this case, the trial court determined that Petitioner's statements were not the product of intoxication, the need for nicotine or the lack of insulin.  A review of the record shows that Petitioner's answers to Mr. Ricketts' questions were not illogical.  The OCCA's decision to affirm the trial court's determination that Petitioner's statements were not involuntary on these grounds is  neither contrary to, nor an unreasonable application of Supreme Court law.

 "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning."  *Davis v. United States*, 512 U.S. 452, 459 (1994).  This Court has reviewed the record of the police interview with Petitioner.  *See* Doc. #15.  Contrary to defense counsel's assertion that Petitioner's wanting "something in writing" was "almost to the point of asking for counsel," it is clear that Petitioner was negotiating for a favorable outcome to his case and not asking for legal representation.

A review of the record of the custodial interview also supports the trial court's finding, as affirmed by the OCCA, that Petitioner understood what was happening during the interrogation and understood his constitutional rights.  Petitioner had previously been incarcerated, and he had also previously been questioned about the same incident that ultimately led to his conviction.

In sum, Petitioner has not established that his will to remain silent was overcome because he had taken pain medication, because he had not taken insulin, or because he needed a cigarette.  Moreover, Petitioner has not established a lack of understanding of the

*Miranda* rights, as read to him by then Detective Ricketts.  Finally, Petitioner has not established that his request for "something in writing" was actually a request for counsel.  To the contrary, Petitioner's statements and his willingness to continue talking to Mr. Ricketts demonstrate that he knowingly and voluntarily waived his right to counsel.  The OCCA's determination of this issue is not contrary to or an unreasonable application of clearly established Supreme Court law nor is it an unreasonable determination of the facts in light of the evidence presented.  Ground Three of the Petition should be denied.

### E.   Ground Four – Sufficiency of the Evidence

Petitioner claims the State failed to prove beyond a reasonable doubt that Petitioner committed first degree felony murder while in the commission of a robbery with a firearm and, therefore, that his conviction violates the Due Process Clause of the United States Constitution.  Specifically, Petitioner claims the evidence was insufficient to establish that he had fired the shots which resulted in the death of Connell Mason, that he had been present when the shots were fired, or that he was involved in the shooting.  Brief in Support at 18.[11] Additionally, Petitioner challenges the testimony of Mr. Perry because Mr. Perry was attempting "to gain special treatment from the police" as demonstrated by Mr. Perry's having

---

[11]Under Oklahoma law, a person who aids or abets another in the commission of a crime is responsible as a principal.  *See Young v. State*, 12 P.3d 20, 40 (Okla. Crim. App. 2000).  To be convicted of felony murder, therefore, it was not necessary that Petitioner fire the fatal shot or even be present when the shot was fired.

"continuously asked for 'favors' from law enforcement and the assistant district attorney." Brief in Support at 19.[12]

On federal habeas review of the sufficiency of the evidence, the proper inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Hamilton v. Mullin*, 436 F.3d 1181, 1194 (10th Cir. 2006) (*citing Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard respects the jury's province to weigh the evidence and draw reasonable inferences from the testimony presented at trial. *Id*. Because sufficiency of the evidence is a mixed question of law and fact, the deference required by both § 2254(d)(1) and (d)(2) is applied. *Maynard v. Boone*, *supra*, 468 F.3d at 673. A federal habeas court must "defer to any determination of factual issues by the state court due

---

[12]Petitioner's argument challenges Mr. Perry's credibility. As the Supreme Court recently reiterated, "[o]ur legal system, however, is built on the premise that it is the province of the jury to weigh the credibility of competing witnesses, and we have long purported to avoid 'establish[ing] this Court as a rule-making organ for the promulgation of state rules of criminal procedure.'" *Kansas v. Ventris*, ___ U.S. ___, 2009 WL 1138842 at *5, n.* (Apr. 29, 2009) (*quoting Spencer v. Texas*, 385 U.S. 554, 564 (1967). Determining Mr. Perry's credibility was within the province of the jury.

to the presumption of correctness afforded by § 2254(e)." *Id.*[13]  The OCCA summarized the

evidence against Petitioner:

> [T]he State presented eyewitness testimony that [Petitioner] was in the
> company of the gunman before the shooting; that [Petitioner] brought the
> gunman to meet the victim before the shooting; that [Petitioner] briefly left the
> scene while the gunman pretended to want to purchase drugs from the victim,
> but proceeded to shoot the victim and take his money; that [Petitioner]
> reappeared shortly after the shooting, that the gunman handed the gun to
> [Petitioner], and that both men fled the scene.  After the shooting, [Petitioner]
> made statements in the presence of others about the plan to rob the victim.
> [Petitioner] made similar admissions to police during a custodial interrogation.
> A rational trier of fact could conclude, as [Petitioner's] jury did, that
> [Petitioner] was guilty of homicide in the commission of an armed robbery.

*See* Response, Exhibit 3, OCCA Opinion at 3.

This Court has reviewed the transcript of trial proceedings in this case and has

determined that the OCCA's summary of the State's evidence in this case is both fair and

complete.  Viewing the evidence in the light most favorable to the prosecution, any rational

trier of fact could have found the essential elements of the crime of felony murder beyond

a reasonable doubt.  The OCCA's opinion was neither contrary to, nor an unreasonable

application of *Jackson v. Virginia*, and Petitioner is not entitled to habeas relief on this issue.

---

[13]In reviewing Petitioner's sufficiency of the evidence claim, the OCCA cited state law and
determined, "A rational trier of fact could conclude, as [Petitioner's] jury did, that [Petitioner] was
guilty of homicide in the commission of an armed robbery."  OCCA Opinion at 3.  As the Tenth
Circuit has found, this standard comports with *Jackson.  See Turrentine v. Mullin*, *supra*, 390 F.3d
at 1203 ("Although the OCCA did not directly cite *Jackson*, it applied an analogous state standard
. . . ; [w]e therefore ask whether the OCCA's decision was contrary to or involved an unreasonable
application of *Jackson*, or whether it was based on an unreasonable determination of the facts in
light of the evidence presented.  28 U.S.C. § 2254(d)(1)-(2).").

### F.    __Ground Five – Cumulative Error__

In his fifth and final ground for relief, Petitioner alleges that cumulative error deprived him of a fundamentally fair trial.  On direct appeal, the OCCA denied Petitioner's claim of cumulative error: "[B]ecause we have identified no error in the preceding propositions, there can be no error by accumulation."  *See* OCCA Opinion at 4.

"Cumulative error analysis is an extension of harmless error and conducts the same inquiry as for individual error focusing on the underlying fairness of the trial."  *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003) (citations and internal quotations omitted).  The analysis recognizes that the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.  *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002).

Petitioner does not cite any particular errors to support his cumulative error claim but rather, in a general way, asks the Court to consider collectively the alleged trial errors to determine their cumulative effect on his conviction and sentence.   Having reviewed Petitioner's claims, this Court finds the OCCA's determination of Petitioner's cumulative error claim is reasonable and entitled to AEDPA deference.  Ground Five of the Petition, therefore, should be denied.

### __RECOMMENDATION__

It is recommended that the Petition for Writ of Habeas Corpus [Doc. #1] be denied. It is further recommended that Petitioner's Motion for Stay [Doc. #12] be denied.  Finally, it is recommended that Petitioner's Motion for Order [Doc. #16] be denied as moot.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to object to this Report and Recommendation. *See* 28 U.S.C. § 636.  Any objections must be filed with the Clerk of the District Court by June __29th__, 2009.  *See* Local Civil Rule 72.1.  Failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein.  *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

## STATUS OF REFERRAL

This Report and Recommendation disposes of all matters referred by the District Judge in this case and terminates the referral.

DATED this __8th__ day of June, 2009.

VALERIE K. COUCH
UNITED STATES MAGISTRATE JUDGE